# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| KIMBERLY FROCK, | : | |
| Plaintiff, | : | |
| | | Case No. 3:09CV0499 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Kimberly Frock sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits ["DIB"] in August 2005, alleging disability since September 1, 2003. (Tr. 60-62). Although Plaintiff originally claimed to be disabled by viral cardiomyopathy and depression (*see* Tr. 103), she later testified and now maintains in this Court that her history of headaches also impedes her ability to work. (*See* Tr. 880-81; Doc. #7).

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

After various administrative proceedings, Administrative Law Judge ["ALJ"] Melvin A. Padilla denied Plaintiff's DIB application based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 25). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and remand for payment of benefits. At a minimum, Plaintiff seeks a remand of this case to the Social Security Administration to correct certain claimed errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

Plaintiff was 41 years old at the time of the administrative decision, and thus was considered to be a "younger person" for purposes of resolving her DIB claim. *See* 20 C.F.R. § 404.1563(c); (*see also* Tr. 60). She has a high school education. *See* 20 C.F.R. § 404.1564(b)(4); (*see also* Tr. 110). Plaintiff has worked in

the past as a customer service representative and as a convenience store clerk. (Tr. 71, 79).

Plaintiff testified at the administrative hearing[2] that she could not work due to fatigue. "I'm tired. I can't withstand physical activity." (Tr. 868). Plaintiff said that she became short of breath easily and was told that her heart didn't function properly. (*Id*.). She also testified to throbbing pain in her right hip. (Tr. 869).

Additionally, Plaintiff testified about her depression. She continued to see a psychiatrist and a counselor. (Tr. 870). She felt that the counseling and medication helped some. (Tr. 872). Her medication caused drowsiness. (Tr. 874). She did not visit friends, family or neighbors. (Tr. 871). Plaintiff testified that she suffered from crying spells. (Tr. 872, 880). She said that she overused her medications because she "hurt so bad on the inside I just keep taking it to try and get away from everything to make it stop." (Tr. 879).

Plaintiff estimated that she could walk for 10 minutes at a time, stand 15 minutes at a time, sit 30 minutes at a time, and lift between 15 and 20 pounds. (Tr. 875). She felt most comfortable reclining. (Tr. 875, 880). Plaintiff was able to

---

[2]Because the alleged errors raised by Plaintiff do not implicate the vocational expert testimony also presented at the administrative hearing, the Court has not summarized that testimony.

use her upper extremities to dress and brush her hair. (Tr. 875). Plaintiff testified

that she had problems with her legs and became short of breath when climbing

stairs. (Tr. 876).

Plaintiff further testified as to her daily activities. She testified that she had

a driver's license and drove maybe three times a week. (Tr. 866). She took

classes at the counseling center and talked on the telephone. She testified that her

husband and daughter handled most household chores, but she occasionally

loaded the dishwasher, vacuumed once a week, did laundry, and did some

dusting. (Tr. 876-80). She watched television, read a lot, cared for four dogs,

helped at the church office one Sunday each month, and attended Saturday

activities at church and weekly church services for 45 minutes. (*Id.*).

When examined by her counsel, Plaintiff also testified that she had four to

five migraine headaches a week. When experiencing a headache, she would take

Fioricet, go to her bedroom, and lie down. Her headaches could last as long as a

day and were associated with nausea and vomiting. (Tr. 880-81).

Plaintiff's medical history, both physical and psychological, is extensive.

As the parties adequately have set out the relevant medical evidence (*See* Doc. #7

at 3-11; Doc. #10 at 2-7), additional detailed discussion of the record would be

unnecessarily duplicative.  Where applicable, the Court will identify the medical evidence relevant to its decision.

## III.    THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A.    <u>Applicable Standards</u>

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  A DIB  applicant bears the ultimate burden of establishing that he or she is under a "disability."  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4); (*see also* Tr. 15-16).  Although a dispositive finding at any Step

terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007),

if fully considered, the sequential review considers and answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
>
> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

**B.    The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the

insured status requirements of the Act through December 31, 2007.  (Tr. 17).  The

ALJ also found that Plaintiff had not engaged in substantial gainful activity from

her alleged onset date of September 1, 2003, through her date last insured of December 31, 2007. (Tr. 18).

The ALJ found at Step 2 that Plaintiff has the severe impairments of residuals of mitral valve replacement; substance abuse, including prescription medication; depression; and anxiety. (*Id.*). The ALJ determined at Step 3 that through her date last insured, Plaintiff did not have an impairment or combination of impairments that met or equaled the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (*Id.*).

At Step 4, the ALJ found that through the date last insured, Plaintiff retained the residual functional capacity ["RFC"] to perform a limited range of light work, with the further limitations to include the option to alternate positions every 15 to 30 minutes; no climbing of ladders or scaffolds; no working at heights; limited to low stress jobs with no dealing with the public, no fast paced work, no work involving inherently stressful or hazardous activities, and low people contact; and limited to unskilled, simple tasks. (Tr. 20). The ALJ further found that Plaintiff was unable to perform her past relevant work. (Tr. 24). Considering Plaintiff's age, education, work experience, and RFC, the ALJ found that through her dated last insured, jobs existed in significant numbers in the national economy that Plaintiff could have performed. (*Id.*). This assessment,

-7-

along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB.  (Tr. 25).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. DISCUSSION

Plaintiff alleges that the ALJ erred in two respects in denying her DIB application. First, Plaintiff challenges the adequacy of the RFC assessment finding that she remains able to perform a limited range of light work, specifically arguing that the ALJ erred by failing to find that her headaches are a severe impairment. (Doc. # 7). Second, Plaintiff contends that the ALJ erred in evaluating her pain and other symptoms because he failed to consider the combined impact of her impairments. (*Id.*).

*RFC Finding/Headaches as Non-Severe Impairment*

A claimant bears the burden of proving at Step 2 that her impairments are severe. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). A severe impairment is one that significantly limits a person's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities relate to those abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions; the capacity to see and hear; and the ability to use judgment, respond to supervisors, or deal with changes in the work setting. 20 C.F.R. § 404.1521(b).

A DIB claimant is not required to establish total disability at the "severe impairment" level of the sequential evaluation, as the severe impairment requirement is simply a threshold element that a plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Sec'y of Health & Human Servs.*, 736 F.2d 352, 357 (6th Cir. 1984). As such, the severity requirement is a *"de minimus* hurdle" in the sequential evaluation process. *Higgs* v. *Bowen,* 880 F.2d 860, 862 (6th Cir. 1988); *see also Rogers,* 486 F.3d at 243 n.2. Accordingly, an impairment will be considered non-severe only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris* v. *Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th

Cir. 1985) (citing *Brady* v. *Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)).  If at step 2 an ALJ "is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities," the ALJ should continue the 5-step evaluation.  Social Security Ruling ["SSR"] 85-28.

Citing to her complaints of headaches documented throughout the medical record, as well as to her hearing testimony regarding headaches (*see* Doc. # 7 at 15; *see also* Tr. 330, 331, 332, 334, 523, 428, 537, 722, 724, 725, 880, 881), Plaintiff contends that the ALJ's failure to find that her headaches were a severe impairment lacks substantial support in the record.  A review of the portions of the medical record cited by Plaintiff confirms the presence of repeated references to Plaintiff experiencing headache pain.  However, the mere quantity of such references does not dictate a conclusion that Plaintiff's headaches constituted a "severe" impairment.

When first seen by neurologist Joel Vandersluis, M.D., on March 4, 2003 (*see* Tr. 333-34), for example, Plaintiff reported "explosive headaches that last[ed] for hours at a time, typically until she t[ook] medication."  (Tr. 333).  At that time, Dr. Vandersluis assessed "[m]igraine headache; rebound headache," along with "[p]robable medication overuse syndrome."  (Tr. 334).  Over a year later, on March 21, 2004, Plaintiff presented to the emergency room due to a headache that

reportedly had begun two days earlier. (Tr. 265-67). At that time, Plaintiff herself denied "a significant history of headache in the past." (Tr. 265). A head CT performed that day showed "[c]hronic sinusitis" as a likely cause of her head pain. (Tr. 268). Plaintiff was hydrated with saline solution, treated with pain medication, and released (Tr. 266-67), with no evidence of other "acute disease." (Tr. 268).

Dr. Matthew E. Peters, a family physician, saw Plaintiff on April 13, 2004, for a one-day history of headache. (Tr. 280). He noted that Plaintiff previously had been seen by a neurologist [Dr. Vandersluis] who was able to control her headaches with medication, and referred Plaintiff back to Dr. Vandersluis, with instructions to resume her prescribed medications. (*Id.*). Plaintiff returned to Dr. Vandersluis on April 27, 2004, complaining of worsening headaches associated with nausea and vomiting. (Tr. 330-31). Dr. Vandersluis assessed probable migraine headaches, placed her on Midrin, and increased her Topamax dosage. (Tr. 331). He also mentioned hydration issues. (*Id.*).

On June 9, 2004, Plaintiff again presented to the emergency room complaining of a headache for the prior three days. (Tr. 523-25). A head CT scan was normal. (Tr. 524). Plaintiff was given Vicodin and released. (*Id.*). Plaintiff returned to the emergency room on November 10, 2004, with various problems,

including a headache. (Tr. 528-30). Plaintiff was diagnosed with acute bilateral otitis, acute sinusitis, and acute pharyngitis, and released with medications for ear infection, plus Vicodin. (Tr. 529). Plaintiff next was treated in the emergency room on January 12, 2005, after falling over her dog and hitting her head. (Tr. 534). She complained of a headache in the area "where she did strike her head." (*Id.*). A head CT scan was normal. (Tr. 535).

On February 11, 2005, Plaintiff was seen in the emergency room because of a headache for the past two days. (Tr. 537-39). Another head CT scan was performed and was normal. (Tr. 538). Plaintiff was treated with nausea and pain medications and released. (*Id.*). Plaintiff was hospitalized on December 3, 2005, for dehydration, nausea, vomiting, and headaches. (Tr. 556-80). A head CT scan showed probable acute sinusitis on the left (Tr. 562), and an EEG was normal. (Tr. 566). Plaintiff was discharged with medications including Xanax, Lortab and Zyprexa. (Tr. 557). Jacob Kitchener, M.D., saw Plaintiff on October 7, 2006, on referral to evaluate a history of headaches and falling. (Tr. 711-14). Dr Kitchener recommended a trial of Verapamil, noting that a CT scan of the head ruled out any organic causes. (Tr. 713).

On February 23, 2007, Plaintiff was brought to the hospital by ambulance following a probable drug overdose. (Tr. 750-56). A large quantity of Plaintiff's

-13-

prescription headache medication was missing.  (Tr. 750, 753).  The next day, Dr.

Kitchener again evaluated Plaintiff.  (Tr. 739-42).  He commented on Plaintiff's

past dependency on Darvocet.  (Tr. 739).  Dr. Kitchener noted that previous

neuroimaging had been unremarkable, and opined that Plaintiff probably was

overusing Fioricet and might be having rebound headaches as well.  (Tr. 741).  At

the administrative hearing in April 2008, Plaintiff testified that she continued to

have frequent migraines that she treated with Fioricet.  (Tr. 880-81).[3]

In finding Plaintiff's headaches to be a "non-severe" impairment, ALJ

Padilla specifically acknowledged Plaintiff's emergency room visits, her normal

CT scans, and Dr. Vandersluis' treatment record, as recited above.  (Tr. 18).  The

ALJ noted that as early as 2003, Dr. Vandersluis, a neurologist, had assessed

Plaintiff with rebound headaches with probable medication overuse syndrome.

(*Id.*; *see* Tr.  334).  Dr. Vandersluis' finding to that effect is corroborated in the

record by Dr. Kitchener's 2007 references to Plaintiff's likely Fioricet overuse and

rebound headaches (Tr. 741), as well as by other allusions to Plaintiff's suspected

abuse of drugs.  (*See infra*).  Where a physician has opined that a claimant's

headaches result from overuse of medications, an ALJ does not err by relying on

---

[3]Significantly, Plaintiff failed to mention her headaches as a source of any functional limitations until questioned by her attorney.  (*See* Tr. 880-81); *see Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (failure to list condition in application may be relevant to analysis).

that opinion to find such headaches to be a non-severe impairment. *See Thompson v. Comm'r of Soc. Sec.*, No. 1:09cv122, 2010 WL 1257888, at **3-4 (S.D. Ohio Jan. 29, 2010) (Black, M.J.) (adopted at 2010 WL 1257886 (S.D. Ohio Mar. 31, 2010) (Dlott, C.J.).

In addition, the record of at least one emergency room visit indicates that Plaintiff's head pain then was due to sinusitis (*see* Tr. 268); another suggests that her head pain at that time was caused by an ear infection (*see* Tr. 529); and yet another attributes her headache on that occasion to striking her head during a fall. (*See* Tr. 534). Each of these findings attributing one of Plaintiff's headaches to a non-recurrent cause tends to bolster the ALJ's conclusion that Plaintiff's headaches were a non-severe impairment. Because the record also tends to suggest that Plaintiff's headaches, even if migraines, might be controlled through medication if used properly (*see, e.g.*, Tr. 280), there is ample evidence in the record to support the ALJ's finding that Plaintiff's headaches were not a "severe" impairment. *See Conner v. Astrue*, No. 3:07cv00872, 2010 WL 455261, at *5 (6th Cir. Feb. 1, 2010) ("the Sixth Circuit has consistently held that if a condition is remediable through medication or treatment, it is not disabling for purposes of a social security determination") (citing *Harris v. Heckler*, 756 F.2d 431, 436 n. 2 (6th Cir.1985)).

Moreover, an ALJ does not commit reversible error by failing to find that a particular impairment is severe where the ALJ determined that the claimant had at least one other severe impairment, and then continued with the remaining steps in the disability evaluation, considering all impairments, including non-severe ones, in determining the claimant's RFC. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). Here, ALJ Padilla found that Plaintiff did have other severe impairments. (*See* Tr. 18). He then continued through the sequential evaluation process until he determined at Step 5 that Plaintiff is not disabled. (*See* Tr. 18-25).

Plaintiff nonetheless contends that this continued analysis did not compensate for the ALJ's purported error in finding her headaches to be non-severe, urging that "there is no evidence that the [ALJ] considered [her] headaches at any point beyond Step 2." (Doc. #7 at 16). A close of review of the ALJ's decision, however, demonstrates otherwise. In assessing Plaintiff's RFC at Step 4, the ALJ specifically found that despite Plaintiff's "medically determinable impairments" her "subjective statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not credible." (Tr. 21). The ALJ noted expressly that Plaintiff "ha[d] been non-compliant" with treatment, and "ha[d] abused prescribed medication," leading "to rebound headaches." (*Id.*; *see*

*also* Tr. 22).  Under these facts, any purported error in the ALJ's failure to find Plaintiff's headaches to be a severe impairment was rendered harmless by his continued analysis of that condition under the required sequential evaluation.

<u>*Evaluation of Pain/Impairments in Combination*</u>

Plaintiff next argues that the ALJ erred in his evaluation of her pain and other symptoms because he failed to consider her impairments in combination. (*See* Doc. #7 at 17).  She maintains that ALJ Padilla "provided little analysis" beyond presuming that any emotional problems Plaintiff experienced "were likely due to substance abuse with situational stressors."  (*Id.*).  She also suggests that the ALJ improperly credited a 2008 cardiac perfusion study while ignoring a echocardiogram performed on the same date, and evaluated her impairments sequentially rather than together, paying little attention to "how [her] mental impairments affected her ability to perform physically."  (Doc. #7 at 18).

Pain or other symptoms may be severe enough to constitute a disability, if caused by a medical impairment.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981) (pain alone may constitute a disability); *see also* 20 C.F.R. § 404.1529.  The Commissioner's Regulations require ALJs evaluating pain or other symptoms to consider all the evidence, including medical history; medical signs and laboratory findings; the claimant's statements; and treating

and other medical source opinions.  20 C.F.R. § 404.1529(c)(1).  Although the

Regulations concerning pain and other symptoms are lengthy, the Sixth Circuit

Court of Appeals has reduced the applicable standard to "a more succinct" two-

part analysis.  *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994).  Part one

considers "whether there is objective medical evidence of an underlying medical

condition."  *Id.* (quoting *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847,

853 (6th Cir. 1986)).  If such objective medical evidence exists, then part two

requires consideration of two alternative questions:

> a.   Whether objective medical evidence
>      confirms the severity of the alleged pain [or
>      other symptom] arising from the condition;
>      or
>
> b.   Whether the objectively established medical
>      condition is of such a severity that it can
>      reasonably be expected to produce the
>      alleged disabling pain [or other symptom].

*Felisky*, 35 F.3d at 1038-39 (quoting *Duncan*, 801 F.2d at 853).

Neither *Felisky's* two-part test nor the Regulations upon which it is based

requires objective medical evidence of pain itself.  *Felisky*, 35 F.3d at 1039.  The

Commissioner promises through the Regulations that "we will not reject your

statements about the intensity and persistence of your pain or other symptoms or

about the effect your symptoms have on your ability to work solely because the

available objective medical evidence does not substantiate your statements." 20

C.F.R. § 404.1529(c)(2). Consequently, the Regulations require ALJs to consider a

list of factors including: the claimant's daily activities; the location, duration,

frequency, and intensity of pain or other symptoms; precipitating and

aggravating factors; type, dosage, effectiveness, and side effects of medications

taken to alleviate symptoms; treatment, other than medication, obtained for

symptom relief; any measures used to alleviate pain (*e.g.*, lying flat, standing 15

or 20 minutes every hour, sleeping on a board, *etc.*); and other factors concerning

the claimant's functional limitations. 20 C.F.R. § 404.1529(c)(3)(I)-(vii); *see* Social

Security Ruling 96-7p.

Additionally, ALJs are "charged with the responsibility of observing the

demeanor and credibility of witnesses." *Bradley v. Sec'y of Health & Human Servs.*,

862 F.2d 1224, 1227 (6th Cir.1988). As a result, an ALJ's findings concerning the

credibility of a claimant's testimony about his or her pain or other symptoms "are

to be accorded great weight and deference," so long as they are supported by

substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.

1997). The Rulings mandate in part as follows:

> The reasons for the credibility finding must be
> grounded in evidence and articulated in the
> determination or decision. It is not sufficient to make a
> conclusory statement that "the individual's allegations

> have been considered" or that "the allegations are (or
> are not) credible."  It is also not enough for the
> adjudicator to simply recite the factors that are
> described in the regulations for evaluating symptoms.
> The determination must contain specific reasons for the
> finding on credibility, supported by evidence in the case
> record, and must be sufficiently specific to make clear to
> the individual and to any subsequent reviewers the
> weight the adjudicator gave to the individual's
> statements and the reasons for that weight.

Social Security Ruling 96-7p, 1996 WL 374186.

In finding that Plaintiff's "subjective statements . . . [about her] symptoms"

were not entirely credible in this case, ALJ Padilla stated as follows:

> The claimant has emotional problems likely secondary
> to substance abuse with situational stressors [that]
> include marital problems, unruly teenage daughter, and
> her mother's death.  She has been non-compliant
> according to treatment notes throughout the record.
> She has abused prescribed medication that has led to
> rebound headaches.  She testified that she only used
> cocaine once.  The records show otherwise.  She denied
> any history of substance abuse while in the ER in
> February 2005.  ER records from July 2006 show she
> denied smoking or alcohol use but her husband
> reported that she was actually using cocaine and [he]
> believed her to be physically dependent.  The following
> month she returned to the ER, denied substance abuse,
> and tested positive for benzodiazepines and cocaine.
> She smokes despite having had cardiac surgery and
> repeated warnings to stop smoking.

(Tr. 21).  The ALJ also found that Plaintiff's "most serious impairment" was "her

polysubstance abuse."  (Tr. 24).  He concluded that while Plaintiff was credible

-20-

regarding the existence of severe impairments, she was not credible as to her claims that such impairments rendered her disabled within the meaning of the Social Security Act. (*Id.*). Because the ALJ's credibility assessment was based on substantial evidence, this Court is obliged to accept that conclusion.

In addition, contrary to Plaintiff's assertion that the ALJ provided little analysis of Plaintiff's underlying impairments, the ALJ's decision reveals that he considered the medical evidence related to Plaintiff's residuals of mitral valve replacement and reasonably determined that the evidence through December 31, 2007, did not support Plaintiff's allegations of pain and symptoms related to that condition. (Tr. 22-23). A stress test from 2003 was negative for ischemia and showed normal ejection fraction, normal blood pressure response and no exercise-induced arrythmias, despite "poor exercise tolerance." (Tr. 180). A 2005 echocardiogram showed a prosthetic mitral valve with mild regurgitation, a normal aortic valve, a normal tricuspid valve with mild to moderate insufficiency, a normal left ventricular ejection fraction, and no pericardial effusion. (Tr. 544-45). In addition, heart examinations throughout the record were essentially normal. (Tr. 180, 229-30, 244, 251, 652). When heart specialist Roberta Erena, M.D., first saw Plaintiff in February 2005, Plaintiff had not seen a cardiologist for years and "was off her Coumadin," but Plaintiff reported "feeling

well" after Dr. Erena put her back on cardiac medication. (Tr. 651). In addition,
when cardiologist Fred Berry, M.D., examined Plaintiff in February 2006, he
found her cardiovascular status to be "stable," and suggested that medication
that Plaintiff was awaiting for treatment of depression might "lead to
improvement" of her condition. (Tr. 630).

Plaintiff nonetheless urges that the ALJ failed to consider how the
combination of her mitral valve problems, her depression and her other
impairments might prevent her from sustaining work activity on a regular and
continuing basis. The Social Security Act requires the Commissioner to consider
the combined effects of impairments that may be nonsevere individually, but that
in combination may constitute a medically severe impairment or otherwise
evidence a claimant's disability. 42 U.S.C. §4 23(d)(2)(C); *Foster v. Bowen*, 853 F.2d
483, 490 (6th Cir. 1988). ALJ Padilla's decision in this case complied with this
statutory mandate.

As noted above, the ALJ found at step 2 of his sequential analysis that
Plaintiff suffered from severe impairments, including "residuals of mitral valve
replacement; substance abuse, including prescription medication; depression;
and anxiety." (Tr. 18). The ALJ then listed the medical evidence that established
Plaintiff's impairments. (Tr. 20-22). The ALJ's consideration of multiple severe

impairments and his use of the plural "impairments" strongly supports an inference that he considered all of Plaintiff's impairments at Step 2.

At Step 3, the ALJ determined that Plaintiff "does not have an impairment or <u>combination of impairments</u>" that meets or equals the severity of a listing-level impairment.  (Tr. 18) (emphasis added).  This conclusion establishes that the ALJ considered the combined impact of Plaintiff's impairments on her work abilities, not only because the ALJ plainly referred to the "combination of impairments" – plural – but also because he reached his conclusion after considering the medical evidence of record concerning Plaintiff's multiple impairments (both physical and mental) and Plaintiff's testimony during the administrative hearing.  (*See* Tr. 18-21); *see also Foster*, 853 F.2d at 490; *cf. Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990) ("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings.").

In support of his decision, the ALJ cited the opinions of Drs. Dietz and Chambly (Tr. 598-615), the state agency reviewing psychologists who concluded that Plaintiff could relate superficially with others and could do simple repetitive tasks, and Drs. Freihofner and Cruz (Tr. 616-23), state agency reviewing

physicians, who concluded that Plaintiff could lift/carry 10 pounds frequently and 20 pounds occasionally, stand or walk six hours a day, and sit six hours a day. The state agency physicians also found that Plaintiff never could crawl or climb ladders, ropes or scaffolds, that and she had to avoid all exposure to hazards such as machinery and heights. The reviewing physicians' opinions constitute expert medical opinions, and provide substantial evidence supporting the ALJ's findings. 20 C.F.R. § 404.1527(f)(2).

As to Plaintiff's argument that the ALJ "ignored" an echocardiogram performed in 2008 (Doc. #7 at 18), the Court notes that Plaintiff's burden is to prove that she was disabled <u>on</u> or <u>before</u> the last date on which she met the special earnings requirement of the Act. *Richardson v. Heckler,* 750 F.2d 506, 509 (6th Cir. 1984) (citation omitted); *Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990). Evidence of a claimant's condition post-insured status generally is not relevant. *Bagby v. Harris,* 650 F.2d 836 (6th Cir.), *cert. denied*, 454 U.S. 1087 (1981); *see also Bogle v. Sec'y of Health & Human Servs.,* 998 F.2d 342 (6th Cir. 1993). Because Plaintiff's date last insured was December 31, 2007, the ALJ did not err by declining to consider Plaintiff's 2008 echocardiogram.

Having determined that Plaintiff's subjective description of her limitations was not credible, the ALJ properly relied on the physician opinions of record

regarding those limitations that the ALJ did find to be credible.  In any event,

Plaintiff does not identify what additional limitations not included in the ALJ's

RFC assessment she believes to result from her impairments.  In short, the Court

concludes that the ALJ applied the correct laws and standards in considering

Plaintiff's claims, and that his findings and conclusions enjoy substantial support

in the record.

        **IT THEREFORE IS RECOMMENDED THAT**:

            1.    The Commissioner's non-disability finding be
                  AFFIRMED; and

            2.    The case be TERMINATED on the docket of this
                  Court.


January 14, 2011                         s/ Sharon L. Ovington
                                      Sharon L. Ovington
                                  United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen [14] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen [17] days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen [14] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981).